IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| NXEGEN, LLC AND NXEGEN HOLDINGS, INC., | ) ) ) |
| Plaintiffs/Counterclaim Defendants, | ) Case No.: 3:12-CV-00528-WGY ) ) ) |
| vs. | ) ) |
| COMVERGE, INC., | ) JULY 3, 2013 ) |
| Defendant/Counterclaim Plaintiff. | ) ) ) |

**COMVERGE, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF
REGARDING COMVERGE PATENTS**

**I.      INTRODUCTION**

Defendant Comverge, Inc. ("Comverge" or "Defendant") submits this brief in response to the Opening Claim Construction Brief of Plaintiffs Nxegen, LLC and Nxegen Holdings, Inc. (collectively "Nxegen") (D.E. 87) and in further support of Comverge's proposed constructions of the disputed terms of U.S. Patent Nos. 5,576,700 ("the '700 patent"), 6,747,571 ("the '571 patent"), and 6,618,709 ("the '709 patent") (collectively, "the Comverge patents").

Comverge has previously demonstrated that the claim terms have clear, plain meanings that do not require additional construction. Nxegen, by contrast, has proposed a series of constructions that impose unrecited limitations into the claims. For example, Nxegen's proposals with regard to the '700 patent attempt to require every element of the claimed apparatus to be part of a "single device." Nxegen's proposed limitation by construction is not in the claims; it accordingly should not be part of the construction. Indeed, the specification discloses multiple embodiments in which the components of this apparatus are distributed among

multiple devices.  For example, as explained below, Figures 1 and 2 plainly show multiple, separate devices.  Nxegen's proposal is accordingly contradicted by the specification.

Nxegen's attempt to incorporate new limitations into the claims is simply litigation strategy masquerading as claim construction, and this Court should reject it.  The Court should therefore adopt Comverge's proposed constructions, including relying on the plain and ordinary meaning of the claim terms for which Comverge has offered no independent construction.

## II.     COMVERGE'S DEFINITIONS FOR THE DISPUTED CLAIM TERMS ARE FULLY SUPPORTED BY THE INTRINSIC EVIDENCE, UNLIKE NXEGEN'S

### A.     *"an improved load control switching and monitoring apparatus" ('700 patent – multiple claims)*

| Comverge's Proposed Construction: | Nxegen's Proposed Construction: |
|---|---|
| No construction necessary | "a single device, that both controls and monitors loads, placed on or in proximity to the end load." |

Nxegen's proposed construction impermissibly restricts the reach of this term to "a single device."  That limitation is not supported by the language of the claim and would be error to adopt.  The specification makes abundantly clear that each of the components of the apparatus may be separate.  For example, Figure 1 "illustrates an electrical load management system 10, including a load control switching and monitoring apparatus 20 . . . ."  *See* '700 patent, col. 6, ll. 39-40.  Contrary to Nxegen's argument, Figure 1 does *not* show load control switching and monitoring apparatus 20 as a single component.  Rather, as is plain from Figure 1, load control switching and monitoring apparatus 20 is bounded by a *dotted line*, indicating that these components are *not* required to be part of a single device.[1]

---

[1] At most the dotted line indicates that the separate components are grouped for purposes of discussion.

2



FIG. 1

The specification makes these points explicit, describing that *each* of the data interface 31 (comprising first monitor 36 and second monitor 38), control unit 32, and data collection system 33 (together comprising the apparatus 20, as shown) may be separate devices that are interconnected. Specifically, the '700 patent states that "***each of the enclosures housing*** the combination of the data interface 31 and control unit 32, and the data collection system 33, is preferably physically located near the electrical load 24 to maintain short wiring connections ***between the interconnected units***." '700 patent, col. 9, ll. 4-9 (emphasis added). If these components were required to be part of "a single device" as Nxegen argues, the specification would not describe "each of the enclosures" as needing to be connected by "wiring connections between the interconnected units." '700 patent, col. 9, ll. 4-9. Thus, Nxegen's proposed construction is completely at odds with the '700 patent specification and should be rejected.

Further, Figure 2 "illustrates the load control switching and monitoring apparatus 20 in more detail." '700 patent, col. 9, ll. 14-15. Figure 2 makes clear that the control unit 32, interface 31, and data collection system 33, each designated by a separate reference numeral, are

separate components. For example, control unit 32 is shown as connected to interface 31 via conductors 66 and 64.



FIG. 2

Nxegen attempts to support its proposed construction by pointing to citations in the patent that suggest that "[i]t would be highly advantageous to implement the system by combining the monitoring and recording functions with the known load control switching function to minimize manufacturing, installation, and maintenance costs." '700 patent, col. 3, ll. 15-19. At best, this refers to only a single embodiment in the specification. The disclosure of one embodiment, however, does not mean that other embodiments, e.g., those described with regard to Figures 1 and 2, may be excluded. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."). Even if this were interpreted to be the preferred embodiment, the Federal Circuit has made clear that a construction should *not* be limited to the preferred embodiment; the law simply requires that the preferred embodiment should not be excluded by the construction. *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013); *see also N. Telecom Ltd. v.*

*Samsung Elecs. Co.*, 215 F.3d 1281, 1293 (Fed. Cir. 2000) ("This court consistently declines to construe claim terms according to the preferred embodiment.").

Nxegen's proposed construction is also contradicted by further evidence. Claim 1 recites an apparatus, and the dictionary definition of apparatus also makes clear that each component may be separate. *See Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1332 n. 1 (Fed. Cir. 2001) (citation omitted) ("Dictionaries, which are a form of extrinsic evidence, hold a special place and may sometimes be considered along with the intrinsic evidence.") The relevant dictionary definition of "apparatus" is "1. The ***totality of means*** by which a designated function is performed or a specific task is executed. 2. a. A machine. b. A ***group of machines*** used together or in succession to accomplish a task." THE AMERICAN HERITAGE DICTIONARY 120 (2d ed. 1985) (emphasis added).[2] By definition, each of the components recited as the apparatus of claim 1 may be separate. The Court should thus reject Nxegen's proposal to limit this term to "a single device."

Nxegen's construction is improper for other reasons as well. The "improved load control switching and monitoring apparatus" is recited in the preamble of, e.g., independent claims 1, 16, 38, and 63 of the '700 patent. It is a fundamental principle of claim construction that the preamble of a claim is not a limitation of the claim. *See Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002) (citation omitted) (generally "the preamble does not limit the claims"); *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 809 (Fed. Cir. 2002), (citing *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1434 (Fed. Cir. 2000)) (finding that a preamble is not regarded as limiting "when the claim body describes a structurally complete invention such that deletion of the preamble phrase does not affect the structure or

---

[2] Attached as Ex. A.

5

steps of the claimed invention."). Nxegen has said nothing to suggest why a term used in the preamble should be construed to limit the claim. Nxegen's construction ignores this basic principle of claim construction to improperly limit the claim to a single device.

There is no need to construe this term. Should the Court nevertheless find that this term requires construction, it should look to Figures 1 and 2, which make clear that in at least several embodiments the control unit and the energy monitoring devices are clearly described as being separate and distinct from one another.

**B.** *"electrical load data" ('700 patent – multiple claims)*

| **Comverge's Proposed Construction:** | **Nxegen's Proposed Construction:** |
|---|---|
| Plain meaning/no construction necessary. | "information collected by the improved control device that measures the energy usage of the controlled device" |

Nxegen's construction of "electrical load data" attempts to impose the phrase "the improved control device" into the otherwise plain meaning of this claim term. This is an attempt by Nxegen to leverage its faulty construction above, requiring the load control switching and monitoring apparatus to be a "single device." As discussed in the previous section, this misconstrues the claim language itself, and Figures 1 and 2 make clear that this is error.

Claim 1, for example, recites a "*first monitoring means* for generating *electrical load data* in response to detecting the distribution and interruption of said energy to said electrical load." '700 patent, col. 19, ll. 25-27 (emphasis added). The plain language of the claim indisputably provides that the first monitoring means generates the electrical load data. Nxegen endeavors to extend the language further, arguing that the first monitoring means is a part of the load control switching and monitoring apparatus. From this premise Nxegen then argues the

information generated by the first monitoring means is collected by "the improved control device." The claim itself accordingly contradicts Nxegen's construction. The claim recites a "data collection means *for collecting* said electrical load data." '700 patent, col. 19, ll. 31-32 (emphasis added). Thus, contrary to Nxegen's proposed construction, it is the data collection means that collects the "electrical load data." Indeed, as explained above, it is error to argue that this data collection means must be part of an encompassing single device; Figure 1 and the '700 patent specification make clear that the data interface 31 and control unit 32, and the data collection system 33 may be separate enclosures with "short wiring connections between the interconnected units." '700 patent, col. 9, ll. 8-9.

Nxegen's proposed construction is also incorrect because it attempts to insert new limitations into the claim language, contrary to the teaching of the Federal Circuit. *See Phillips*, 415 F.3d at 1312 ("It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" (citing *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc*., 381 F.3d 1111, 1115 (Fed. Cir. 2004))). Nowhere do any of the claims recite a "controlled device." As an informed reading discloses, the specification does not even recite the existence of a "controlled device." Nxegen's construction imposes this new limitation, without any support in the intrinsic record, or from anywhere else. This construction too is plainly incorrect and should be rejected.

Nxegen's faulty construction would serve only to confuse the jury. The phrase "electrical load data" is clear on its face and requires no construction.

C. *"electrical load control data" ('700 patent – multiple claims)*

| **Comverge's Proposed Construction:** | **Nxegen's Proposed Construction:** |
|---|---|
| Plain meaning/no construction necessary. | "information collected by the improved control device as to the state of the controlled device" |

Claim 1 of the '700 patent also includes the term "electrical load control data." The only difference between this term, and "electrical load data," discussed above, is the addition of the word "control." As Comverge's opening brief explains, the addition of this word does not render the claim language confusing to the jury, and thus no construction is required. In fact, it is Nxegen's proposed construction that creates confusion by again improperly inserting a wholly unsupported limitation, "controlled device" into the claim language. This limitation has no support in either the claim or the specification, contradicting the most fundamental tenets of claim construction. *See Phillips*, 415 F.3d at 1316-17 ("Indeed, the rules of the PTO require that application claims must 'conform to the invention as set forth in the remainder of the specification and the terms and phrases used in the claims must find clear support or antecedent basis in the description so that the meaning of the terms in the claims may be ascertainable by reference to the description.'" (quoting 37 C.F.R. § 1.75(d)(1))).

Nxegen's proposed constructions again attempts to insert "the improved control device" into this limitation. But claim 1 recites a "*second monitoring means* for generating *electrical load control data* in response to detecting the control operation of said control means." '700 patent, col. 19, ll. 28-30 (emphasis added). The plain language of the claim is unmistakable: the second monitoring means generates the electrical load control data. Nxegen again argues that

8

the second monitoring means is part of the load control switching and monitoring apparatus and therefore the information generated by the first monitoring means is collected by "the improved control device." As explained above, the claim itself makes clear that this is error: the claim recites a "data collection means *for collecting* . . . said electrical load control data." '700 patent, col. 19, ll. 31-32. (emphasis added). Thus, contrary to Nxegen's proposal, it is the data collection means that collects "electrical load control data." Further for all the reasons discussed above, Figure 1 and the specification show that the data interface 31 and control unit 32, and the data collection system 33 may be separate enclosures with "short wiring connections between the interconnected units." '700 patent, col. 9, ll. 8-9.

Nxegen's proposed construction is unclear and invites error. The phrase "electrical load control data" is clear on its face and requires no construction.

### D. *"electrical load control data packets" ('700 patent – multiple claims)*

| **Comverge's Proposed Construction:** | **Nxegen's Proposed Construction:** |
|---|---|
| "a collection of electrical load control data" | "formatted data transmitted by the improved control device about the state of the controlled device" |

Nxegen again attempts to insert "the improved control device" into its construction of this term. This is no more than a repackaged attempt to require that every component recited by the apparatus of claim 1 be part of a single device. For all the reasons discussed above, this is plainly incorrect. The claims describe an apparatus that includes a "communicating means for transmitting said plurality of electrical load-control data packets." '700 patent, col. 19, ll. 47-48. Figure 2 makes clear that this component, the communicating unit 96, within a separate dotted-

9

line enclosure, may be separate from the other components of the load control switching and monitoring apparatus.



FIG. 2

Nxegen invites the Court to conflate the various components of the claimed apparatus into a single device, which restricts the claims beyond the limitations the claim language requires and ignores the teachings of the specification. That would be error. *See Phillips*, 415 F.3d at 1316. ("In light of the statutory directive that the inventor provide a 'full' and 'exact' description of the claimed invention, the specification necessarily informs the proper construction of the claims." (citing *Merck & Co. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003)).

As discussed in Comverge's opening brief, Nxegen's proposed construction is incorrect for the additional reason that it adds entirely new limitations. There is no suggestion in either the claim language or the '700 patent's specification that the data contained in the electrical load control data packets is "formatted." In fact, the word "formatted" appears nowhere in the '700 patent. Nor is there any description of "formatted data" to be found. Nxegen fails even to explain what "formatted data" might mean in the context of the '700 patent. Thus, Nxegen's proposal is both incorrect and will create confusion rather than clarify the meaning of the claims

10

for the jury. Nxegen's proposal thus imposes requirements into this claim for no reason other than its litigation strategy to narrow the scope of the claim.

Similarly, Nxegen seeks to further narrow the claim language by requiring the electrical load control data packets to include data "about the state of the control device." The state of the control device is not recited by claim 2. However, separately, in claim 3, the electrical load control data packets are required to contain "information relating to the operating status of said control means . . . ." '700 patent, col. 19, ll. 52-53. Thus, adopting Nxegen's construction would violate the doctrine of claim differentiation. "To the extent that the absence of such difference in meaning and scope would make a claim superfluous, the doctrine of claim differentiation states the presumption that the difference between claims is significant." *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1369-70 (Fed. Cir. 2007) (citing *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987)).

Contrary to Nxegen's proposed construction, Comverge's proposal stays true to the plain meaning of the claims. As Comverge explained earlier, "electrical load control data" requires no additional construction. Thus, the remaining issue is the construction for the term "packets." Claim 2 states in relevant part "recording means for recording said electrical load control data and said electrical load data during a plurality of predetermined time intervals to produce a plurality of electrical load control data packets and a plurality of electrical load packets . . . ." The claim language makes clear that the "recording means" records electrical load control data *during multiple time intervals* to produce electrical load control data packets. Accordingly, the packets refer to this collection of electrical load control data.

E.  *"in response to detecting the distribution and interruption of said energy" ('700 patent – multiple claims)*

| Comverge's Proposed Construction: | Nxegen's Proposed Construction: |
|---|---|
| Plain meaning/no construction necessary. | "in response to the improved control device detecting the load's energy distribution and whether the load is turned off" |

Nxegen's proposed construction is little more than the language of the claim, with the phrase "improved control device" inserted and "interruption" replaced with "turned off." Neither change is warranted. The insertion of "the improved control device" into Nxegen's construction is yet another example of Nxegen's attempt to require every component of the load control switching and monitoring apparatus to be in a "single device." In this context, Nxegen stretches the claim language far past its intended meaning, as the claim makes clear that it is only the "***first monitoring means***" that generates "electrical load data ***in response to detecting the distribution and interruption*** of said energy to said electrical load." '700 patent, col. 19, ll. 25-27 (emphasis added).

Nxegen further distorts the claim by replacing "interruption" with "turned off," arguing that without construction the jury will not understand what "distribution and interruption" means. Nxegen agrees, however, that "distribution" is clear, as it proposed no construction for this term. Thus, Nxegen's position is that the jury will not understand the meaning of "interruption of said energy." This is difficult to believe. The term "interruption" is well known, and there is no need to replace it with yet another definition. Nxegen's proposal in fact creates confusion where none exists in plain meaning. Nxegen's proposed construction should be rejected

12

F.  *"information relating to the operating status of said control means" ('700 patent – claim 3)*

| **Comverge's Proposed Construction:** | **Nxegen's Proposed Construction:** |
|---|---|
| Plain meaning/no construction necessary. Alternatively "information relating to the state of the control means" | "information relating to the state of the improved control device" |

Nxegen's entire argument for this term is that claim 3 depends from claim 2, which depends from claim 1, and because claim 1 recites "an improved load control switching and monitoring apparatus" claim 3 must necessarily refer to this improved load control switching and monitoring apparatus. Thus, Nxegen asserts that "the reference in claim three to 'said control means' therefore must refer to 'the improved control device.'" (D.I. 87, p. 9.) Nxegen's "logic" is flawed. Nxegen again attempts to require all the components recited by claims 1-3 to be part of a single device. For all the reasons above, this is error. The claim term refers to "said control means," which is a limitation clearly introduced in claim 1: "*control means* for controlling said electrical load in said electrical distribution network." '700 patent, col. 19, ll. 21-22. There is simply no explanation why the plain meaning of the claim should be distorted to refer to the operating state of "the improved control device," rather than the "control means" as plainly recited by the claim. It is unquestionable that the control means is merely a component, and not the control apparatus itself.

Correcting Nxegen's proposed construction to refer to the operating status of the control means does no more than revert to the original claim language. Accordingly, the Court should not construe this claim language as suggested by Nxegen. Plain meaning suffices.

13

G. *"gateway meter management component" ('571 patent – multiple claims)*

| Comverge's Proposed Construction: | Nxegen's Proposed Construction: |
|---|---|
| "hardware or software for facilitating communication between the meter and the host device" | "communicating software that allows the first transmitter to interrogate the meter's data registers and transfer that information to a secondary host device" |

Nxegen's proposed construction attempts to limit this term to software alone. Nxegen supports its constructions by citing sections of the specification that suggest that gateway refers to "gateway software." However, Nxegen ignores the portions of the '571 patent specification that describe the functions performed by the gateway meter management component as alternatively being performed by software or hardware. Specifically, "the gateway software 110 may be embedded in the system 10 without the need to add additional hardware circuitry. However, it will be appreciated that the functions of the gateway software 110 could be obtained by coupling a *dedicated processor and memory to the hardwired connection* 55 *or by imbedding the gateway software* 110 within an existing processor and memory associated with each meter 25." '571 patent, col. 7, ll. 34-41 (emphasis added). Thus, the specification teaches clearly that the "gateway meter management component" should not be limited to software alone.

Nxegen's proposed construction is incorrect for the additional reason that Nxegen seeks to distort the claim language and require that software "interrogate the data registers of the meters." The terms "interrogate" and "data registers" are not found anywhere in the claim, nor will they facilitate comprehension of the claim language by a jury. In fact, neither the term "interrogate" nor the term "data registers" is used anywhere in the '571 patent specification. Nxegen has fabricated them out of whole cloth. These terms create confusion rather than

14

provide clarity regarding the meaning of "gateway meter management component" because the scope of the claim becomes entirely unclear. Thus, to incorporate these unclaimed and unsupported terms into the construction would constitute clear error.

In contrast, Comverge's proposed construction stays true to the plain meaning of the claim language and intrinsic evidence, and should be adopted.

### H. *"one of periodically and aperiodically" ('709 patent – multiple claims)*

| **Comverge's Proposed Construction:** | **Nxegen's Proposed Construction:** |
|---|---|
| "either in regular time intervals or irregular time intervals" | "one at regular intervals of time and of irregular occurrence" |

Nxegen's proposed construction distorts the plain meaning of this term by modifying "***one of*** periodically and aperiodically" to instead recite "one at." Nxegen's proposed change impermissibly alters the term's plain meaning because "one of" clearly requires a choice and, in contrast, "one at" clearly requires a combination. Thus, Nxegen's proposed construction ignores clear diction and proposes changing the meaning of the phrase to "one at" ***both*** "regular intervals of time and of irregular occurrence." If not an overt paradox, this is at least not the manifest meaning and intent of the claim, and should be rejected.

Nxegen compounds its error by inexplicably defining "periodically" as "regular intervals of time," while defining "aperiodically" as "of irregular occurrence." This creates ambiguity by suggesting that "periodically" and "aperiodically" do not refer to the same kind of measurement. However, both refer to a time interval, and it should be referenced consistently throughout the construction of this term. Comverge's construction does so.

Nxegen's brief argues that Comverge replaces the conjunction "and" with "or." This is correct. And the definition Comverge offers is likewise correct. Notwithstanding the

15

conjunction, the phrase "one of" requires a choice. For example, if told to select "one of the apple and the orange" the choice is one or the other, not both. Thus, Comverge's construction, which conforms to grammatical convention, is correct and should be adopted.

### I. *"resource usage" ('709 patent – multiple claims)*

| **Comverge's Proposed Construction:** | **Nxegen's Proposed Construction:** |
|---|---|
| "the use of assets or material that can be monitored" | "end device energy usage" |

Nxegen's construction is incorrect for several reasons. First, Nxegen improperly limits the claimed "resource" not only to energy, but to energy that is used by an "end device." The claims make clear that the "resource usage" in question may be of far more than a single device. Claim 1 recites "computer network based monitoring of *resource usage* for at least one energy provider providing energy to a *plurality of resource users*." '709 patent, col. 36, ll. 50-52 (emphasis added). Similarly, claim 12 recites "*resource usage* data measured by a *plurality of resource meters* operationally connected to a *plurality of remotely located resource consuming devices*." '709 patent, col. 38, ll. 57-58 (emphasis added). Thus, the claims themselves make clear that resource usage should *not* be limited to a single user, much less a single device, as Nxegen's proposed construction attempts to do.

It is also incorrect to limit, as Nxegen seeks to do, "resource usage" to a single resource: energy. The plain language of "resource usage" does not suggest that it should be limited to energy. Importantly, the specification states that "[p]lainly, the instant invention may be adapted to any resource usage that may be monitored." '709 patent col. 3, ll. 26-27. The specification provides examples of various types of assets or materials that could be monitored, including "electricity, natural gas, gasoline, cable television, band width, telecommunications, short

distance service, long distance service, water, Internet usage, radio usage, cellular usage, digital data (bits and/or quantities thereof) usage, satellite usage, and the like." '709 patent, col. 3, ll. 15-26. Thus, the specification contradicts any attempt to limit the definition of "resource" to energy. Comverge's proposed construction allows for these other types of resources. Thus, Comverge's construction is correct and should be adopted.

J.  *"energy provider"/"energy provider providing energy" ('709 patent – multiple claims)*

| Comverge's Proposed Construction: | Nxegen's Proposed Construction: |
|---|---|
| Plain meaning/no construction necessary | "an entity in the business of providing energy to customers" |

The terms "energy provider" and "energy provider providing energy" are clear on their face and require no construction. Nxegen attempts to obfuscate the plain meanings of these terms by including the additional phrase "in the business of." There is no support for the phrase, "in the business of," in any of the claims. Further, the specification makes clear that an energy provider does not have to be in the sole business of providing energy to customers, as Nxegen's construction suggests. Specifically, the specification references how a department store chain "or other energy provider could put some or all the stores together alone or in combination with other blocks of stores/energy as a company or a single organization from the perspective of a utility supplier." '709 patent, col. 16, ll. 64-66. The specification plainly discloses that the energy provider does not have to be an entity in the business of providing energy, but rather could be a department store chain for example. Nxegen's proposed construction fails to consider this intrinsic evidence.

The Court should find that the meaning of this term is clear on its face, and no construction is needed.

## III.  CONCLUSION

For all the foregoing reasons and those previously argued to the Court, Comverge respectfully requests that the Court adopt Comverge's constructions of the disputed claim terms of the patents-in-suit.

DEFENDANT/COUNTERCLAIM
PLAINTIFF, COMVERGE, INC.


/s/ Jonathan B. Tropp_____

Jonathan B. Tropp (ct11295)
jbtropp@daypitney.com
Cecilia Zhang Stiber
cstiber@daypitney.com
Day Pitney LLP
One Canterbury Green
Stamford, CT  06901
Tel.:  (203) 977-7300
Fax:  (203) 977-7301


Frederick L. Whitmer
Kilpatrick Townsend & Stockton LLP
The Grace Building
1114 Avenue of the Americas
New York, NY  10036-7703


Wab P. Kadaba
Kilpatrick Townsend & Stockton LLP
1100 Peachtree St. NE
Suite 2800
Atlanta, GA 30309

Its Attorneys

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY THAT on July 3, 2013, a copy of the foregoing memorandum was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

THIS IS TO FURTHER CERTIFY THAT a copy of the foregoing memorandum was sent directly to Hon. William G. Young, c/o Jennifer Gaudet, United States District Court, Clerk's Office, Suite 2300, 1 Courthouse Way, Boston, MA  02210.


/s/Jonathan B. Tropp